UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., and American Telephone and Telegraph Company, Defendants.

UNITED STATES of America, Plaintiff,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.

Civ. A. No. 82–0192.
Misc. No. 82–0025 (PI).

United States District Court, District of Columbia.

Dec. 1, 1983.

James P. Denvir, Michael F. Altschul, Luin P. Fitch, J. Philip Sauntry, Jr., Richard Levine, U.S. Dept. of Justice, Antitrust Div., Washington, D.C., for plaintiff.

Howard J. Trienens, Jim G. Kilpatric, John D. Zeglis, Francine Berry, New York City, for defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

On October 18, 1983, the Federal Communications Commission issued an order suspending from January 1 to April 3, 1984 the access charge tariffs filed by the Operating Companies. On October 28, 1983, AT & T advised the Court that it and the Operating Companies had agreed on contracts to govern the compensation which the local companies would receive from AT & T for their services to that company during the three-month period of the suspension. On the same date, the Bell Atlantic Telephone Companies filed a motion requesting that the Court clarify their obligations under the decree in light of the FCC order, and that the Court reject as inconsistent with the decree the proposed replacement financial arrangement based on division of revenues procedures. In Bell Atlantic's view, that arrangement would continue a partnership between AT & T and the Operating Companies, and Bell Atlantic proposed that the Court prescribe instead an arrangement under which the Operating Companies would be compensated by AT & T in a manner similar to that required by the plan of reorganization for shared network facilities.

On November 1, 1983, the Court requested the parties to brief the issues raised by the Bell Atlantic motion and the AT & T plan. Ten days later, Bell Atlantic requested leave to withdraw its earlier motion, advising the Court that it had come to an agreement in principle with AT & T whereby AT & T would be charged access rates based on the tariffs before the FCC [1] which would provide the Operating Companies a return of 11.5 percent on their investment devoted to providing access services to AT & T. Several of the intervenors object to this new arrangement as they did to the previous one, and on November 22, 1983, the Court held a hearing to consider the issues raised by these developments.

I

The motion and the request for a withdrawal raise two questions: (1) whether the interim arrangement between AT & T and the Operating Companies is consistent with the decree, and (2) if it is not, whether the Court should nevertheless grant a waiver of the decree's requirements so that the arrangement may be implemented.

Several of the parties argue that the AT & T-Operating Company arrangement is consistent with and not violative of the decree on the following basis. Section B(1) of Appendix B of the decree requires the Operating Companies to file access charge tariffs "to become effective on the effective date of the reorganization," but the decree is silent as to any approval of these tariffs by the Federal Communications Commission. The appropriate tariffs having been duly filed, it is thus suggested, there is no violation: the FCC's failure to act is irrelevant.[2]

That argument takes an unduly myopic view of this provision and of the decree itself. The purpose of section B(1) of Appendix B is not the technical, ministerial one of having tariffs on file at the FCC; its purpose is to sever the partnership bonds which exist between AT & T and its local operating companies—a partnership which, according to the complaint in this case, was the foundation stone for massive and long-lasting violations of the antitrust laws. That purpose obviously is not served by the

---

1. This agreement does not affect interexchange carriers other than AT & T. See p. 657 *infra.*

2. See, *e.g.,* AT & T Reply at 14 n. **; see also, Response of the United States at 4 n. *, 6.

mere filing of ineffective tariffs; it is served only by their implementation, that is, by the replacement of the existing division of revenue processes by new arrangements which establish and regularize a new, arm's length relationship between AT & T and its former partners in the Bell System.

Specific provision for the establishment of valid—that is, FCC-approved—tariffs prior to divestiture was not included in the decree, as drafted by the parties and as modified and approved by the Court, presumably because no one considered it a real possibility in January 1982, when the decree was filed with the Court and thus made generally available, that two years later, in January 1984, the Commission would still not have acted on the tariff filings. Accordingly, conscious of the responsibilities of the Federal Communications Commission and wishing to avoid, insofar as possible,[3] any interference with those responsibilities, the parties and the Court saw no real need for making specific provision in the decree beyond the filing of the tariffs.[4]

Throughout the period when the Court has been responsible for passing on and construing the decree, it has consistently regarded as paramount the decree's purposes[5] whenever the language itself permitted more than one interpretation.[6] The Court would not be justified now, with respect to the present controversy, to exalt form over substance any more than it has in the past. To test that proposition, one might consider, for example, the theoretical possibility that the FCC, for one reason or another, refused ever to approve access tariffs or that it approved them only after years of delay. It is quite obvious that the consequent continuing partnership between AT & T and the Operating Companies would strike at the heart of the decree, vitiate its fundamental purposes, and thus could not, consistently with those purposes, be sanctioned by the courts.

To be sure, we are faced here not with that extreme situation but only with a delay of three months' duration. That circumstance, however, bears only on the appropriateness of the Court's grant of a waiver, not on the question whether a continuing post-divestiture relationship between AT & T and the Bell System companies on a basis other than tariff is violative of the decree.

The Court, accordingly, finds that the interim agreement between AT & T and the Operating Companies is inconsistent with the decree in that it provides for compensation to be paid by AT & T to the Operating Companies on a basis other than contemplated and required by section B(1) of Appendix B of the decree. The interim arrangement is further violative of the decree in that it continues Operating Company participation in interexchange telecommunications prohibited by section II(D)(1) of the decree, and it contravenes that provision of the plan of reorganization (at 64–65) which specifies that the cost of capital to

3. Obviously, since the decree operates in an area where the FCC regulates, albeit not to the exclusion of the antitrust laws (see, e.g., *United States v. AT & T*, 461 F.Supp. 1314, 1320–30 (D.D.C.1978)) there is bound to be some concurrence or overlap of responsibilities.

4. Had the FCC delay been conceived of as possible, or even likely, it might have been feasible to make alternative arrangements in the decree, e.g., to provide for approval of the access tariffs by the Court or a body designated by and responsible to it. See also, note 12 *infra*.

5. See, e.g., *United States v. Western Electric Co.*, 569 F.Supp. 1057, 1071–74, 1076–77 (D.D.C. 1983) (division and apportionment of contingent liabilities, assignment of Bell name); *United States v. Western Electric Co.*, 569 F.Supp.

990, 995–97 (D.D.C.1983) (determination of size of LATAs).

6. That, it seems to the Court, is the only appropriate approach to a document, which like this decree, establishes merely a broad outline of a plan for an extremely complex transaction or series of transactions with massive implications, leaving many details for subsequent implementation. Guidelines for the construction and implementation of the decree have been established through the plan of reorganization as well as through the Court's Opinions. See also sections VII and VIII(I) of the decree which anticipate the need for construction by the Court.

be used for computation of the rate of return for shared network facilities shall be the *authorized* rate of return for plant used in interstate services, *i.e.,* 12.75 percent. See Part III *infra.*[7]

## II

The delay ordered by the FCC expires on April 3, 1984. The Court is advised by the parties that, in any event, (1) the Commission must allow the access tariffs filed by the Operating Companies, or some variation thereof, to become effective on April 15, 1984, inasmuch as the ENFIA tariffs which are based on voluntary agreements, expire on that date;[8] and (2) the Operating Company tariffs will take effect on May 1, 1984, under a provision of law which does not permit the FCC to suspend tariffs for more than five months.[9]

The Court has not investigated or considered whether the Commission has the authority under its enabling statutes to ignore these deadlines and thus to prolong the present impasse. The Court assumes that the Commission will not do so, first, because that agency, like this Court, is surely sensitive to the need for everyone, particularly those in governmental authority, to minimize any existing uncertainties and their duration,[10] and second, because

the Commission, like this Court in this and in past instances,[11] would not wish to precipitate a conflict between the agency's responsibilities and a court judgment.[12]

For purposes of the resolution of the present motions, the Court will assume, therefore, that the current arrangement between AT & T and the Operating Companies is strictly of an interim nature and will expire in April 1984.

## III

In addition to the conceptual objection to the AT & T-Operating Company arrangement—that it perpetuates the partnership relationship among the entities—those who oppose that arrangement attack primarily the rate of return that the Operating Companies will earn on their investment devoted to providing access to AT & T.

The current authorized rate of return is 12.75 percent;[13] yet the interim arrangement provides to the Operating Companies only a rate of 11.5 percent. The opponents suggest that it is difficult to understand why the Operating Companies would settle for a return less than that which, according to their representations both to the federal and state regulators, they require in the

---

**7.** See also, the Department of Justice's Competitive Impact Statement which states (at 20) that the Department "expects that all ... contracts that establish an ongoing economic integration between AT & T and the divested BOCs will be terminated."

**8.** See AT & T Reply at 5–6; *Exchange Network Facilities for Interstate Access* (Extension Order), 90 F.C.C.2d 6, 16–17 (1982), *aff'd sub nom., MCI v. FCC,* 712 F.2d 517, 522–29 (D.C.Cir.1983).

**9.** See 47 U.S.C. § 204(a) ("... the Commission ... may suspend the operation of such charge ... in whole or in part but not for longer period than five months beyond the time when it would otherwise go into effect"); Tr. 25, 736–37.

**10.** For that reason, the Court will in the next few days issue Opinions and Orders disposing of all the recently-filed motions that remain pending and that should be decided prior to the divestiture (*i.e.,* the controversies regarding presubscription, weather and time announcements, and FX service in certain suburban areas).

**11.** See, *e.g., United States v. AT & T,* 552 F.Supp. 131, 169 n. 161, 173, 197 (D.D.C.1982); *United States v. AT & T, supra,* 461 F.Supp. at 1329.

**12.** That judgment, moreover, has been affirmed by the Supreme Court of the United States. See *Maryland v. United States,* —— U.S. ——, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). The FCC has acknowledged that, in general, neither the Communications Act nor Commission actions taken pursuant thereto immunize the carriers and their conduct from the operation of the antitrust laws and that, indeed, the agency has limited authority with respect to the structure of the telephone industry. See Memoranda of FCC as Amicus Curiae of December 30, 1975 and November 4, 1976, and Memorandum reprinted at 62 F.C.C.2d 1102, 1117–18 (1977). These rules presumably also govern the remedial stages of an antitrust judgment.

**13.** *In re AT & T,* FCC Docket No. 79–63 (May 1981); *aff'd* in *United States v. FCC,* 707 F.2d 610 (D.C.Cir.1983).

context of arm's length bargaining.[14] They view this lower rate of return as suspect, especially since, in their view, the Operating Companies expect to earn a rate of return of 12.75 percent from their end users. The basic response made by AT & T is that, whatever may be the authorized rate of return, various factors (*e.g.*, wage increases and increases in depreciation rates) have combined to reduce the actual earnings realized under the joint rates to less than 11.5 percent,[15] and that an arrangement based on that figure is therefore justified.

AT & T's assumptions may well be correct, but the fact is that the precise basis therefor—*e.g.*, the impact of the wage increases on the rate of return—has been a matter of understanding and agreement among the Bell System partners rather than of a tariff passed on by a governmental body with due opportunity for scrutiny of all the relevant factors. Similarly, Bell Atlantic states that the agreement "would require the BOCs to provide AT & T with access services in return for access charges, imposed on an arm's length basis, without the involvement of any sharing of costs or earnings between AT & T and the divested Bell Companies." Notice of Withdrawal at 4. Since the agreement represents a private arrangement between AT & T and the Operating Companies, these observations too, and others like them, must be taken largely on faith.[16] In fact, the agreement has not been submitted for approval either to this Court or to the FCC.

That lack of outside scrutiny does raise some concerns.

Notwithstanding these considerations, the Court will grant a waiver of the decree's provisions so as to sanction the present arrangement for an interim period. The parties appear to have made an effort to approximate the access tariff mechanism contemplated by the decree as closely as they were able to do. The present arrangement is a relatively brief one, expiring approximately three months from the date of divestiture. And even that deviation from the terms of the decree was brought about not by a deliberate action of the parties but was, in effect, forced upon them by the FCC's failure to act on tariffs which had been timely submitted.

Accordingly, the Court hereby rules, in the exercise of its authority under sections VII and VIII(I) of the decree, that notwithstanding section II(D), section B(1) of Appendix B, the provisions of pp. 64–65 of the plan of reorganization, and the fundamental purpose of the decree to end the association between AT & T and the Operating Companies, these entities may, after January 1, 1984 and until April 3, 1984, operate with respect to compensation for AT & T's access according to the terms of their agreement announced to the Court by the Bell Atlantic notice of November 10, 1983.[17]

14. See, *e.g.*, Reply Comments of Public Service Commission of the State of Missouri at 5–6.

15. See AT & T Reply at 3 n. **. AT & T also states that its dealings with the Operating Companies in this respect do not differ from those which it has had with the independent telephone companies for many years. See Tr. at 25, 718–19.

16. See also, letter of November 17, 1983 from the City Attorney of Los Angeles, and Response of Virginia State Corporation Commission at 5.

17. In view of the concern expressed by several intervenors, the Court reiterates that settlement payments to the independent telephone companies are not affected by the Court's action herein, nor does the arrangement between AT & T and the Operating Companies bind or affect state officials with regard to their authority to suspend, reject, or approve intrastate access charges. AT & T has advised the Court that it will offer the independent companies, including Southern New England Telephone and Cincinnati Bell, their choice of either an arrangement similar to that available to the Operating Companies, or a settlement with AT & T on the basis of the combined interstate operations of the independent companies and AT & T. AT & T Reply at 11. Finally, as noted in note 1 *supra* the interim arrangement between AT & T and the Operating Companies will not affect the payments for access service by AT & T's competitors, whose payments will continue to be governed by the ENFIA rates.