988 F.2d 174
 300 U.S.App.D.C. 226
 NATIONAL RURAL TELECOM ASSOCIATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Telephone and Telegraph Company, US West
Communications, Inc., GTE Telephone Operating Companies,
Ameritech Operating Companies, Southwestern Bell Telephone
Company, Maryland People's Counsel, NYNEX, Pacific Bell and
Nevada Bell, BellSouth Corporation, South Central Bell and
Southern Bell Telephone and Telegraph Company, ALLTEL
Service Corporation, Telephone Utilities Exchange Carrier
Association, United States Telephone Association, MCI
Telecommunications Corporation, National Association of
Regulatory Utility Commissioners, Metropolitan Fiber
Systems, Inc., Ad Hoc Telecommunications Users Committee,
National Cable Television Association, Inc., International
Communications Association, Tele-Communications Association,
Telephone and Data Systems, Inc., Public Service Commission
of the District of Columbia, United Telecommunications,
Inc., Intervenors.
The ORGANIZATION FOR the PROTECTION AND ADVANCEMENT OF SMALL
TELEPHONE COMPANIES, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Telephone and Telegraph Company, US West
Communications, Inc., GTE Telephone Operating Companies,
Ameritech Operating Companies, Southwestern Bell Telephone
Company, Maryland People's Counsel, NYNEX,
Pacific Bell and Nevada Bell, BellSouth
Corporation, South Central Bell and Southern Bell Telephone
and Telegraph Company, ALLTEL Service Corporation, Telephone
Utilities Exchange Carrier Association, United States
Telephone Association, MCI Telecommunications Corporation,
National Association of Regulatory Utility Commissioners,
Metropolitan Fiber Systems, Inc., Ad Hoc Telecommunications
Users Committee, National Cable Television Association,
Inc., International Communications Association,
Tele-Communications Association, Telephone and Data Systems,
Inc., Public Service Commission of the District of Columbia,
United Telecommunications, Inc., National Association of
State Utility Consumer Advocates, Intervenors.
NATIONAL TELEPHONE COOPERATIVE ASSOCIATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Telephone and Telegraph Company, US West
Communications, Inc., GTE Telephone Operating Companies,
Ameritech Operating Companies, Southwestern Bell Telephone
Company, Maryland People's Counsel, NYNEX, Pacific Bell and
Nevada Bell, BellSouth Corporation, South Central Bell and
Southern Bell Telephone and Telegraph Company, ALLTEL
Service Corporation, Telephone Utilities Exchange Carrier
Association, United States Telephone Association, MCI
Telecommunications Corporation, Metropolitan Fiber Systems,
Inc., Ad Hoc Telecommunications Users Committee, National
Cable Television Association, Inc., International
Communications Association, Tele-Communications Association,
Telephone and Data Systems, Inc., Public Service Commission
of the District of Columbia, United Telecommunications,
Inc., Intervenors.
MCI TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Telephone and Telegraph Company, US West
Communications, Inc., GTE Telephone Operating Companies,
Ameritech Operating Companies, Southwestern Bell Telephone
Company, Maryland People's Counsel, NYNEX, Pacific Bell and
Nevada Bell, BellSouth Corporation, South Central Bell and
Southern Bell Telephone and Telegraph Company, ALLTEL
Service Corporation, Telephone Utilities Exchange Carrier
Association, United States Telephone Association, Ad Hoc
Telecommunications Users Committee, Bell Atlantic,
Tele-Communications Association, Public Service Commission
of the District of Columbia, Central Telephone Company,
Pennsylvania Public Utilities Commission, Intervenors.
 Nos. 91-1300, 91-1303, 91-1304 and 91-1326.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 17, 1993.
Decided March 26, 1993.
 
 [300 U.S.App.D.C. 228] Petitions for Review of Orders of the Federal Communications Commission.
 Frank W. Krogh, with whom Donald J. Elardo and Loretta J. Garcia were on the brief, for petitioner in case No. 91-1326.
 Margot S. Humphrey, with whom David Casson, L. Marie Guillory and Lisa M. Zaina were on the joint brief, for petitioners in Nos. 91-1300, 91-1303 and 91-1304.
 Laurence N. Bourne, Counsel, Federal Communications Commission (FCC), with whom Renee Licht, Acting Gen. Counsel, David M. Armstrong, Associate Gen. Counsel, John E. Ingle, Deputy Associate Gen. Counsel, FCC, and Robert B. Nicholson and Robert J. Wiggers, Attys., Dept. of Justice, were on the brief for respondents.
 
 
 1
 Alfred W. Whittaker, with whom John G. Mullan, Floyd S. Keene, John Thorne, Michael D. Lowe, Richard C. Hartgrove, Thomas A. Pajda, Gail L. Polivy, Ward W. Wueste, Jr., Richard McKenna, William B. Barfield, M. Robert Sutherland, Saul Fisher, Mary McDermott, Robert B. McKenna, James P. Tuthill, Margaret deB. Brown and Jeffrey B. Thomas were on the joint brief, for intervenors Bell Operating Companies and GTE intervenors.
 
 
 2
 John Glynn, Robert L. Duston, and Gary L. Lieber were on the brief, for intervenors Consumer and Ratepayer.
 
 
 3
 Margot S. Humphrey and Calvin Simshaw were on the joint statement in lieu of brief, for intervenors Telephone Utilities Exchange Carrier Ass'n and Telephone and Data Systems, Inc.
 
 
 4
 Carolyn C. Hill was on statement in lieu of brief, for intervenor ALLTEL Service Corp.
 
 
 5
 Alfred W. Wittaker, Floyd S. Keene, and Michael S. Pabian entered appearances, for intervenors Illinois Bell Telephone Co., Indiana Bell Telephone Co., Inc., Michigan Bell Telephone Co., The Ohio Bell Telephone Co., Wisconsin Bell, Inc. (Ameritech).
 
 
 6
 Richard C. Hartgrove and Thomas A. Pajda entered appearances, for intervenor Southwestern Bell Telephone Co.
 
 
 7
 Paul Rodgers, Charles D. Gray and James B. Ramsey, entered appearances, for [300 U.S.App.D.C. 229] intervenor Nat. Ass'n of Regulatory Utility Com'rs.
 
 
 8
 Gail L. Polivy and Richard McKenna entered appearances, for intervenor GTE Service Corp. and GTE Telephone Operating Companies.
 
 
 9
 Andrew L. Lipman entered an appearance, for intervenor Metropolitan Fiber Systems, Inc.
 
 
 10
 Marc E. Manly and Francine J. Berry entered appearances, for intervenor American Tel. and Tel. Co.
 
 
 11
 Martin T. McCue entered an appearance, for intervenor U.S. Telephone Ass'n.
 
 
 12
 Charles C. Hunter, and James S. Blaszak entered appearances, for intervenor Ad Hoc Telecommunications User Committee.
 
 
 13
 Jeffrey B. Thomas, James P. Tuthill, Margaret deB. Brown and Stanley J. Moore entered appearances, for intervenors Pacific Bell and Nevada Bell.
 
 
 14
 Brian R. Moir entered an appearance, for intervenor International Communications Ass'n.
 
 
 15
 Brenda L. Fox and David L. Nicoll entered appearances, for intervenor Nat. Cable Television Ass'n, Inc.
 
 
 16
 Frank W. Krogh, Donald J. Elardo and Loretta J. Garcia entered appearances, for intervenor MCI Telecommunications Corp.
 
 
 17
 Robert B. McKenna entered an appearance, for intervenor US West Communications, Inc.
 
 
 18
 William B. Barfield, R. Frost Branon, Jr., and M. Robert Sutherland entered appearances, for intervenors BellSouth Corporation, South Central Bell Telephone Co., et al.
 
 
 19
 Gary L. Lieber, J. Thomas Esslinger, Denise Bonn, Robert L. Dunston and John M. Glynn entered appearances, for intervenor Maryland People's Counsel.
 
 
 20
 R. Michael Senkowski entered an appearance, for intervenor Tele-Communications Ass'n.
 
 
 21
 Peter G. Wolfe entered an appearance, for intervenor Public Service Com'n of District of Columbia.
 
 
 22
 H. Richard Juhnke entered an appearance, for intervenor United Telecommunications, Inc.
 
 
 23
 Donald W. Boecke, Mary McDermott and Saul Fisher entered appearances, for intervenors New York Telephone Co. and New England Telephone, et al. (NYNEX).
 
 
 24
 Before: MIKVA, Chief Judge, WILLIAMS and SENTELLE, Circuit Judges.
 
 
 25
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 26
 At issue in this appeal are two Federal Communications Commission orders implementing "price cap" rate regulation for the interstate services of local telephone exchange companies ("LECs"). Policy and Rules Concerning Rates for Dominant Carriers, Second Report and Order, 5 FCC Rcd 6786 (1990) ("LEC Price Cap Order "), on reconsideration, 6 FCC Rcd 2637 (1991) ("LEC Reconsideration Order "). Under the orders, all the Bell and GTE companies must shift to price cap regulation; all other LECs may but need not make the change. Although no party challenges the Commission's basic decision to move to price caps, petitioners here attack special aspects of the plan.
 
 
 27
 On one side, small local telephone companies, represented by various associations, claim that ancillary rules adopted to preserve the effectiveness of price caps unduly restrain telephone company mergers and acquisitions. On the other, MCI, a major user of LEC's services, attacks the rules on the ground (in essence) that the Commission has failed to preserve certain restraints provided by rate-of-return regulation. We start by briefly stating the overall purposes of the Commission in shifting from rate-of-return to price cap regulation and then turn to the specific challenges. Finding the Commission orders neither arbitrary nor capricious, we affirm.
 
 Background
 
 28
 Rate-of-return regulation is based directly on cost. Firms so regulated can charge [300 U.S.App.D.C. 230] rates no higher than necessary to obtain "sufficient revenue to cover their costs and achieve a fair return on equity." Policy and Rules Concerning Rates for Dominant Carriers, Further Notice of Proposed Rulemaking, 3 FCC Rcd 3195, 3211 (1988) ("Further Notice "). As one virtue of perfect competition is that it drives prices down to cost, rate-of-return regulation seems on its face a promising way to regulate natural monopolies, in principle roughly duplicating the benefits of competition.
 
 
 29
 By the late 1980s, however, the FCC began to take serious note of some of the inefficiencies inherent in rate-of-return regulation. First, the resulting cost incentives are perverse. Because a firm can pass any cost along to ratepayers (unless it is identified as imprudent), its incentive to innovate is less sharp than if it were unregulated. There is even a temptation toward "gold-plat[ing]"--using equipment or services that are not justifiable in purely economic terms, especially when their use improves the lot of management (elegant offices, company jets, etc.). LEC Price Cap Order, 5 FCC Rcd at 6853 n. 450.
 
 
 30
 Second, rate-of-return regulation creates incentives for cost shifting that may defeat the regulatory purpose and have other ill effects. Firms can gain by shifting costs away from unregulated activities (where consumers would react to higher prices by reducing their purchases) into the regulated ones (where the price increase will cause little or no drop in sales because under regulation the prices are in a range where demand is relatively unresponsive to price changes). See Policy and Rules Concerning Rates for Dominant Carriers, Notice of Proposed Rulemaking, 4 FCC Rcd 2873, 2924 (1989) ("Second Further Notice "). Third, rate-of-return regulation is costly to administer, as it requires the agency endlessly to calculate and allocate the firm's costs. LEC Price Cap Order, 5 FCC Rcd at 6791.
 
 
 31
 In 1987, then, the FCC began proceedings to explore price cap regulation as an alternative. Policy and Rules Concerning Rates for Dominant Carriers, Notice of Proposed Rule Making, 2 FCC Rcd 5208 (1987) ("First Notice "). Under a price cap scheme, the regulator sets a maximum price, and the firm selects rates at or below the cap. Because cost savings do not trigger reductions in the cap, the firm has a powerful profit incentive to reduce costs. Nor is there any reward for shifting costs from unregulated activities into regulated ones, for the higher costs will not produce higher legal ceiling prices. Finally, the regulator has less need to collect detailed cost data from the regulated firms or to devise formulae for allocating the costs among the firm's services.
 
 
 32
 The above somewhat overstates the differences. Under rate-of-return regulation, the regulator sets ceilings on the basis of cost estimates, in turn based in large part on past costs. To the extent that a firm in any single period (i.e., between rate filings) can beat the estimates, it can keep the savings. Thus "regulatory lag" creates some incentive to economize under a rate-of-return scheme. But the incentive is muted, as a saving in one period will cause lower ceilings thereafter. On the other side, price cap regulation cannot quite live up to its promise as stated above. The Commission must select a formula for the cap--here it chose existing rates, plus an escalator based on general price inflation, minus an annual percentage reduction for expected savings from innovation and other economies. LEC Price Cap Order, 5 FCC Rcd at 6792, 6814. Obviously no such formula can be perfect, so ultimately the Commission must check to see whether the cap has gotten out of line with reality. The prospect of that next overview may dampen firms' cost-cutting zeal. See Further Notice, 3 FCC Rcd at 3396 n. 780.
 
 
 33
 In any event, the FCC in 1989 concluded that price cap regulation would on balance be an improvement over rate-of-return in terms of meeting its statutory goals. Policy and Rules Concerning Rates For Dominant Carriers, 4 FCC Rcd 2873, 2876 (1989) ("AT & T Price Cap Order "). Although the initial order applied price cap regulation only to AT & T, it made clear that the Commission also had the LECs in mind for future application. Then, in 1990 [300 U.S.App.D.C. 231] and 1991, the Commission extended price cap regulation to the LECs, though with a "more cautious and careful approach" in light of the variety of companies and the differences between the markets affected. LEC Price Cap Order, 5 FCC Rcd at 6787. That involved, for example, making the shift optional for all but the Bell and GTE LECs. We will discuss other details in the context of the challengers' claims.
 
 The small telephone companies' claims
 
 34
 The National Rural Telecom Association and two other associations of small telephone companies challenge rules the Commission developed to govern the relation between price cap regulation and companies' mergers and acquisitions. These merger rules arise from two other features of the Commission's price cap plan for LECs--the "all or nothing rule" and the "permanent choice rule". Under all-or-nothing, an LEC choosing price cap regulation is required to shift all of its affiliates to price caps as well. The FCC feared that without this requirement, an LEC with affiliates under both regimes might attempt to shift costs from the price cap affiliate to the rate-of-return affiliate. LEC Reconsideration Order, 6 FCC Rcd at 2706. This of course would be a variation on the sort of cost shifting between an enterprise's regulated and unregulated affiliates that is a concern under rate-of-return regulation generally.
 
 
 35
 The permanent-choice rule requires an LEC choosing price caps to remain under that regime. Without a bar against reversion to rate-of-return, the Commission was concerned that a firm might "game the system": build up its plant through capital investment under rate-of-return, then convert to price caps for the period during which the plant improvements pay off. Such behavior, in which an LEC would alternately "fatten up" and "slim down", see id., is a sequential version of the cost shifting that is conventionally an object of concern. Like the all-or-nothing rule, then, permanent-choice aimed at preserving the cost incentives that are central to price cap regulation.
 
 
 36
 The Commission found that these rules implied a special rule on mergers and acquisitions--the "forced conversion rule", 47 CFR § 61.41(c). Under this rule, when rate-of-return companies and price cap companies merge or acquire one another, the rate-of-return company must convert to price cap regulation within one year. For the purposes of the rule, the acquisition of even a part of an LEC's service area is treated as the acquisition of an entire LEC. LEC Reconsideration Order, 6 FCC Rcd at 2706 n. 207; 47 CFR § 61.41(c). Of course an implication of the rule is that no company under price cap regulation can ever revert to rate-of-return through the device of acquiring, or merging with, a rate-of-return company.
 
 
 37
 It seems clear that in the absence of the forced conversion rule there would be at least some risk of evasion of the all-or-nothing and permanent-choice rules. Acquisition or merger without forced conversion would immediately create a dual-status firm--with the cost-shifting risk that all-or-nothing is designed to cure. And if successive mergers or acquisitions enabled a firm to shift back and forth between rate-of-return and price cap (as would be true if hybrid firms could satisfy the all-or-nothing rule by shifting to rate-of-return), there would be a risk of the sequential cost shifting that the permanent-choice rule seeks to prevent. Of course to say that there is a risk is not to say that the risk is so severe as to justify restrictions that materially impede otherwise desirable mergers and acquisitions; trade-offs must be made. Accordingly, the Commission said that it might waive the rule where the efficiencies of a transaction appeared to outweigh the "gaming the system" risks. LEC Reconsideration Order, 6 FCC Rcd at 2706 n. 207.
 
 
 38
 The small telephone companies here broadly disparage the Commission's concern over cost shifting. Yet they explicitly recognize the historic concern in the context of regulated and unregulated affiliates, evidently balking only at the Commission's extension of the concern to the context of price cap and rate-of-return affiliates. But it seems quite obvious that dual [300 U.S.App.D.C. 232] regulation (price cap and rate-of-return) has a key feature in common with the regulated-unregulated dual status: a firm can escape the burden of costs incurred in its unregulated or price cap business by shifting them to the rate-of-return affiliate, which can pass them on to ratepayers. Second Further Notice, 4 FCC Rcd at 3178.
 
 
 39
 The small telephone companies next argue that even if cost shifting is a legitimate concern, the Commission could and should have relied on less drastic solutions. First, some LECs made vague reference to state and federal accounting and reporting requirements that they argued would adequately impede cost shifting. See Joint Appendix ("J.A.") at 498-500, 517-18, 590-92. But the Commission responded that the state regulation was aimed at spotting cost shifting as between intrastate and interstate operations and was thus of little relevance for cost shifting entirely within the federal domain. See LEC Price Cap Order, 5 FCC Rcd at 6820. Further, it noted that state and corporate restraints varied among states and companies, so that it would be naive to suppose that such measures supplied a uniformly non-porous barrier to cost shifting. See id. at 6850 n. 360. The companies note that this court has previously chided the Commission for failing to pay enough attention to state law constraints on FCC-regulated companies, see NARUC v. FCC, 737 F.2d 1095, 1128 (D.C.Cir.1984); ALLTEL Corp. v. FCC, 838 F.2d 551, 560 (D.C.Cir.1988), but in those cases the Commission had disregarded state legal barriers to a specific type of cost shifting that it was compelling LECs to perform. Id. at 1128. Here, even assuming the Commission paid as little attention as it did there, the challengers' claim is only a generalized assertion of some redundancy between FCC and state regulations.
 
 
 40
 The companies also suggest that the Commission disregarded its own precedent, noting instances where, in the face of cost-shifting risks, it had accepted a "structural safeguard[ ]" in the form of separate incorporation, and even an instance, Computer III, 104 FCC 2d 958 (1986),[1] where it dropped the structural requirement in favor of nonstructural accounting devices. While it is true that in Computer III the Commission relaxed structural requirements on LECs operating in both the competitive data processing business and the regulated telephone services market, see id. at 1011-12, it acknowledged that neither structural separation nor the non-structural alternatives were ironclad guarantees against cost shifting. Id. at 1010. It concluded on balance, however, that in the conditions prevailing in the relevant markets the efficiencies to be secured by replacing structural with non-structural barriers outweighed the risks. Id. at 1011-12. See LEC Price Cap Order, 5 FCC Rcd at 6820 (comparing the two situations). Only a very careful and detailed comparison between Computer III and the present case could persuade us that there was genuine inconsistency, and the small telephone companies have not even attempted such a comparison.
 
 
 41
 The small telephone companies also argue that the forced conversion rule is inconsistent with the FCC's abandonment of a similar rule in a context that the companies argue is analogous. The Commission allows LECs involved in mergers to retain their pre-merger "pooling" status, even though that may lead to hybrids, and despite some acknowledged concern about cost shifting. See Amendment of Part 69 of the Commission's Rules Relating to the Common Line Pool Status of Local Exchange Carriers Involved in Mergers or Acquisitions, 5 FCC Rcd 231 (1989). Neither the companies nor the Commission develops its argument here in much detail, but the Commission observes, as it did in the decision under review, that because pooled and unpooled affiliates are both subject to rate-of-return regulation, the risk of cost shifting at the expense of ratepayers is greatly reduced. See LEC Price Cap Order, 5 FCC Rcd at 6821. In the absence [300 U.S.App.D.C. 233] of any clear response by the small companies, this seems to us adequately to distinguish the cases.
 
 
 42
 The small companies find the Commission's anxiety about permanent choice in the merger/acquisition context particularly far-fetched. While they acknowledge the legitimacy of the Commission's concern for firms' alternately fattening up and slimming down, they argue that it is too weak to support the requirement that, where a price cap firm affiliates with a rate-of-return firm, the latter must switch over to price cap. (The all-or-nothing constraint could be satisfied by the price cap component's returning to rate-of-return.) Any inference of intent to "game the system" is most improbable in that context, they say, as it would require collusion between buyer and seller. They find the Commission's requirement particularly outrageous as applied to acquisitions of a mere segment of an LEC.
 
 
 43
 The behavior giving rise to Commission concern does not seem so obviously remote to us. If the buyer of a "slimmed down" price cap operation could return it to rate-of-return regulation, and thereby finance the necessary improvements largely at the expense of ratepayers, the owners might be tempted--even without assurance of a sale--to engage in slimming down. They could anticipate that, because of the prospect of a switch to rate-of-return, potential buyers would not fully discount the price to take account of the slimming. Thus, dispensing with the Commission rule could create a genuine temptation to cut corners.
 
 
 44
 Nor do we think it fair to say, as the small telephone companies do, that the Commission disregarded the potential benefits of mergers and acquisitions that its forced conversion rule may impede. Not only did the Commission note those values, see LEC Reconsideration Order, 6 FCC Rcd at 2706, but it limited the forced conversion rule to accommodate them. First, it exempted "average schedule" companies. See 47 CFR § 61.41(c)(3). These are small LECs (about 650 out of 1400 total LECs) that have their rates computed from a model of standard costs implemented by the National Exchange Carrier Association. See ICORE, Inc. v. FCC, 985 F.2d 1075 (D.C.Cir.1993). Because these companies are compensated on the basis of standardized rather than individualized cost estimates, they do not have a conventional rate-of-return firm's temptations for cost shifting or gold-plating.
 
 
 45
 In addition, the Commission has stated that it will consider waiver of the all-or-nothing rule, especially for sales of partial exchanges, and in fact it has already provided one such waiver. See US West Comm. & Gila River Tel. Inc., 7 FCC Rcd 2161 (1992). As this court has held, waiver processes are a permissible device for fine tuning regulations, particularly where, as here, the Commission must enact policies based on "informed prediction". Telocator Network v. FCC, 691 F.2d 525, 550 n. 191 (D.C.Cir.1982). So long as the underlying rules are rational, as we find them to be here, waiver is an appropriate method of curtailing the inevitable excesses of the agency's general rule. ALLTEL Corp. v. FCC, 838 F.2d 551, 561 (D.C.Cir.1988).
 
 MCI's claims
 
 46
 To understand MCI's claims we must first examine some of the mechanics of the price cap scheme and their relation to the Commission's concerns. A price cap enables a firm to raise the price of a product or service, so long as the firm offsets any increase for one service with decreases for others within the comparison group selected by the regulator. Thus, if the firm in the benchmark period[2] provided 100 units of service A for $1 each and 100 units of service B for $2 each, for a total of $300, it could thereafter choose any A-B price combination that, at the benchmark volume of sales, would yield no more than $300. (For example, it could sell the A services at $.75 each and the B services at $2.25 each. 100 X $.75 = $75; 100 X $2.25 = $225; $75 + [300 U.S.App.D.C. 234] $225 = $300.) All the LECs provide multiple services. The broader the comparison group within which an LEC may use offsets, the greater its price-changing flexibility. At one extreme, the Commission could have imposed a single price cap reflecting the prices for all of an LEC's services, weighted for the volume of sales of each service in the initial benchmark period. At the other extreme, the FCC could have imposed a price cap on each individual service that an LEC provides, giving the LEC no flexibility whatever. In fact the Commission chose a middle course, dividing LEC services into four product "baskets".[3] A basket is a broad grouping of LEC services subject to its own price cap. LEC Price Cap Order, 5 FCC Rcd at 6811. The Commission set separate price caps for each basket in order to limit an LEC's ability to cross subsidize among groups of services. Id.
 
 
 47
 We here use the term cross-subsidization simply but consistently to refer to prices that are not based on each specific service's average costs, or, in the jargon of the trade, "fully distributed costs" or "FDCs". In a company producing multiple services, FDCs are computed by allocating to each service any costs exclusive to it, plus a share of joint costs (e.g., operating overhead) deemed proportionate by the regulator. Whereas above we consistently used the term cost shifting in contexts where the conduct was likely to be harmful (e.g., between differently regulated affiliates), something that any regulator would properly seek to reduce, we here use "cross-subsidization" as an entirely neutral term describing any deviation from fully distributed cost pricing.
 
 
 48
 As the Commission plainly and explicitly recognized, deviations from fully distributed costs are in certain respects highly desirable and may tend to maximize the consumer welfare created by a regulated natural monopoly. While in a competitive market consumer welfare is maximized by marginal cost prices, that option is not realistically available for regulators of a natural monopoly. Because a natural monopolist is operating in a range where average costs are declining, and therefore where marginal costs are below average costs, marginal cost pricing would not permit the firm to recover its total costs. Further Notice, 3 FCC Rcd at 3257. Thus the so-called "first best" efficient outcome is impossible, as its implementation would put the regulated firm out of business. As the Commission recognized, however, a regulator can realistically seek to achieve "second best" efficiency: the set of prices that allows the firm to recover its total costs while minimizing adverse effects on consumer surplus--the difference between the price of a good and what consumers would be willing to pay for that good. Id. at 3257-58.
 
 
 49
 The orthodox concept of second best pricing is the inverse elasticity principle, or Ramsey pricing. The price increments over marginal cost are allocated in inverse proportion to the price elasticity of demand for the good or service, with the increments relatively high for services for which demand is inelastic, low for those for which demand is elastic. The upshot is to minimize the aggregate impact of the price increments on consumer demand and thereby maximize consumer surplus. Id. at 3258. As the Commission noted, a price cap regime is likely to induce companies to set Ramsey prices. Within the comparison group for which the price cap is defined (in the Commission's terms, within a "basket"), a firm can enhance its profits by increasing (as compared to fully distributed cost pricing) the proportion of shared costs borne by the inelastic services; the effect of the decrease in sales there will (up to a point) be more than offset by the effect of the increase in sales due to corresponding price decreases for the price-elastic service. See id. The same price changes increase consumer surplus as well.
 
 
 50
 The Commission clearly adopted this basic understanding. It said, for example, that "the goal is to determine the 'second best' pricing methodology, one that permits [300 U.S.App.D.C. 235] the recovery of total company costs while minimizing the adverse impact on consumers' surplus." Id. at 3257 (footnote omitted). It observed that price cap regulation "encourages efficient pricing by providing regulated carriers a measure of flexibility to adjust their rates to conform with prevailing market demand." Id. It also noted that "a carrier's ability to adjust prices constitutes one of the major benefits of incentive regulation." Second Further Notice, 4 FCC Rcd at 2924.
 
 
 51
 The Commission, however, was unwilling to embrace the efficiency goals of inverse elasticity pricing without limit. First, it expressed some concern about possible anticompetitive consequences, see, e.g., LEC Price Cap Order, 5 FCC Rcd at 6811-12, though never spelling these out in any detail. It also identified two side effects that it wished to limit--"subjecting ratepayers to precipitous changes in the prices for LEC services," id. at 6811, and, as it expressed the point, "enabling LECs to disadvantage one class of ratepayers to the benefit of another class", id.
 
 
 52
 The second side effect requires an extra word of explanation. If one takes fully distributed cost pricing as a norm, it is true by definition than any shift in the direction of Ramsey pricing will enable "LECs to disadvantage one class of ratepayers to the benefit of another class." Customers purchasing services for which aggregate demand is inelastic will face price increases, while those who purchase products for which demand is elastic will benefit from price decreases. The Commission's discussions of Ramsey pricing manifest its understanding that this was necessary. In context, then, the Commission's reference to price changes that "disadvantage one class of ratepayers to the benefit of another" can only mean that the Commission was concerned about possible unfairness to buyers whose demand was inelastic--an entirely understandable distributive concern, as by definition such buyers are ones whose alternative options are relatively limited. In short, then, the Commission set out to balance efficiency goals with distributive concerns relating to abruptness of price changes and burdens on consumers with limited choices.
 
 
 53
 The devices used to achieve the balance were "baskets" and "bands". Baskets are subsets of LEC services to which the price caps are applied; if services A and C are in different baskets, an LEC cannot justify an increase in the price of A by a decrease in that of C. Bands are still further subdivisions, "service categories" within a basket. An LEC may raise the aggregate prices of services grouped in a band (subject of course to compliance with the basket price cap), but any use of "streamlined" review procedures for such changes is limited to changes of no more than plus or minus 5% a year. LEC Price Cap Order, 5 FCC Rcd at 6811-12.
 
 
 54
 We now turn to MCI's complaints about the Commission's decisions as (1) to the relation between baskets and its "sharing" rule, and (2) the streamlined review procedures.
 
 
 55
 Sharing. The price cap is annually reduced by 3.3% to reflect the Commission's estimate of obtainable efficiency gains, based on historic industry efficiency gains of 2.8% plus a "consumer productivity dividend" of 0.5%. LEC Price Cap Order, 5 FCC Rcd at 6798-99. But as a "backstop" to prevent LECs that greatly exceed that productivity goal from earning what it viewed as excessive profits, the Commission established a "sharing rule". Under the rule an LEC may keep all profits within 1% above a specified rate of return, must rebate half of the profits between 1% and 5% above that rate, and must rebate all profits exceeding it by more than 5%. Id. at 6801.
 
 
 56
 What MCI disputes is the Commission's decision that sharing should be calculated on overall firm profits, not on the profits from individual baskets. Id. In rejecting MCI's proposal that sharing be triggered by "excess" returns within each basket, the Commission explained that as the productivity index was based on overall trends, not basket trends, basket-based sharing measures would not fit the origins of the sharing theory. Id. at 6805. Moreover, since the Commission recognized that any [300 U.S.App.D.C. 236] sharing scheme would tend to dampen the cost-reducing incentives sought by the price cap scheme, see LEC Price Cap Order,5 FCC Rcd at 6801; Second Further Notice, 4 FCC Rcd at 3216, the more stringent the sharing rule the fewer the cost-saving benefits. Finally, basket-level sharing would require continued application of existing fully distributed cost methodologies, thereby preventing prices from moving toward efficient (i.e., second best efficient, Ramsey) levels. LEC Reconsideration Order, 6 FCC Rcd at 2680. The possible stakes of the last point were considerable; the Commission noted studies suggesting that insistence on fully distributed cost pricing in the telecommunications industry was reducing consumer surplus by perhaps $3 billion a year in 1985 dollars. Further Notice, 3 FCC Rcd at 3258 n. 210.
 
 
 57
 Some of the Commission's wording in its explanation is a bit confusing. For example, it said, "[w]e are not persuaded that rate of return-based allocations would inhibit improper cross-subsidization more than they would inhibit desirable initiatives toward more efficient pricing." LEC Reconsideration Order 6 FCC Rcd at 2680. As "initiatives toward more efficient pricing" constitute cross-subsidization (in the neutral sense of a deviation from fully distributed cost pricing), a literalist could find the sentence internally contradictory. In context, given the Commission's clear desire to generate powerful incentives to reduce costs and to move toward inverse elasticity pricing, coupled with its expressions of concern about the risk that such pricing might be unfair to the most inelastic consumers, the only sensible reading of the sentence is that the Commission regarded overall sharing as implementing a better balance of its efficiency and distributional goals than would basket sharing.
 
 
 58
 MCI's basic argument is that overall sharing does not retain as much of rate-of-return regulation as sharing by basket would have, and that therefore it is arbitrary. The first part of the proposition is clearly correct, the second a complete non sequitur. MCI tries to achieve its goal by transparent verbal manipulations. Since the Commission said that the quest for just and reasonable rates called for use of baskets (to limit "discrimination" and cross-subsidization), and since basket sharing would more effectively limit discrimination and cross-subsidization, MCI claims that the Commission has been internally inconsistent.
 
 
 59
 As we have said, some of the Commission's language is confusing. But its basic trade-off is clear, and MCI never adduces a single argument as to why MCI's favored balance--weighted much more heavily against cost-reduction incentives and against inverse elasticity pricing--was so clearly preferable as to render the Commission's choice arbitrary. That the Commission was somewhat concerned about deviations from fully distributed cost pricing did not require it to abandon its concern for cost incentives and for second best efficiency. To the extent that MCI is obliquely making a claim that the statutory "just and reasonable" rate requirement mandates use of fully distributed costs and bars moves toward inverse elasticity prices, our precedent is squarely against it. See, e.g., Associated Gas Distributors v. FERC, 824 F.2d 981, 1010-11 (D.C.Cir.1987), and cases cited therein. As MCI has failed to show anything arbitrary in the point selected by the Commission to balance its conflicting goals, or anything fundamentally wrong with the Commission's reasoning process, we reject MCI's claim.
 
 
 60
 Streamlined tariff review. For tariff changes that are below cap and within band, the Commission provided for streamlined review. Such changes require only 14 days notice rather than the usual 45, are relieved of the need for supporting data as to fully distributed costs, and, because they enjoy a presumption of reasonableness, are not to be automatically suspended. LEC Price Cap Order, 5 FCC Rcd at 6821-22. MCI complains that the Commission did not supply a reasoned explanation for this streamlining. The nub of its claim is that the Commission had previously applied streamlined review only where the regulated firm was disciplined by competition. In allowing streamlined review for certain price changes by the LECs, which have [300 U.S.App.D.C. 237] local market power, the FCC (it argues) allegedly veered impermissibly from prior policy.
 
 
 61
 MCI's argument misstates the record. Indeed the Commission adopted streamlined tariff review for the AT & T price cap plan, but its rationale was that price cap and band restrictions provided adequate insurance against unreasonable filings. Second Further Notice, 4 FCC Rcd at 3093. The FCC was explicit in distinguishing AT & T from non-dominant carriers, which had been allowed streamlined review because of the constraints of competition. It said that "the reasons for employing streamlining in a price cap environment for dominant carriers are different from the reasons elaborated in Competitive Carrier with regard to non-dominant carriers", Further Notice, 3 FCC Rcd at 3369 (emphasis added), explaining under price cap regulation "streamlining is warranted due to the limitations placed on carrier pricing by price caps and pricing bands", id. at n. 699. See also AT & T Price Cap Order, 4 FCC Rcd at 3303 (competition is not the foundation on which agency authority to establish a no-suspension zone is built). It is unambiguous that the Commission considered AT & T a dominant carrier.
 
 
 62
 MCI invokes one phrase in the AT & T Price Cap Order, in which the Commission, after reciting the regulatory constraints of the AT & T price cap mechanism as a justification for expecting AT & T's streamlinable filings to be reasonable, refers to the prices as "further restrained by competition". Id. at 3099. The phrase, together with the Commission's other analysis of the issue, does not make streamlining contingent on the presence of competition.
 
 
 63
 MCI's effort to distinguish streamlining for the LEC's from that for AT & T is therefore spurious, and misrepresents the record in this case. The agency adequately explained in its Further Notice its grounds for extending streamlined review to dominant carriers under price caps. That same rationale underlies the extension of streamlined tariff filings for the LECs. LEC Price Cap Order, 5 FCC Rcd at 6791, 6822. We find the Commission's explanation both reasonable on the record as a whole, and sufficiently explained to avoid any semblance of an impermissible "swerve" in agency policy. Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970).
 
 
 64
 We further note, as did the Commission, LEC Price Cap Order, 5 FCC Rcd at 6822, that even streamlined tariffs do not escape FCC scrutiny; MCI can petition for review of any streamlined tariff that it believes unreasonable. In addition, below-band filings do not enjoy streamlined review at all and, in order to prevent predation, are to be suspended if the rates fail to cover average variable cost. See id. at 6824. Despite MCI's cries about cross-subsidization, it launches no attack on the Commission's choice of average variable cost as a trigger for suspension, a telling omission. In light of the FCC's objective of eliminating the filing burdens on both itself and the carriers, and its reasonable finding that caps and bands render the prospect of unreasonable filings sufficiently improbable, we find streamlined review to be reasonable.
 
 
 65
 MCI also makes passing reference to contentions that it made to the Commission that the prerequisites for efficient Ramsey pricing were missing in the LECs' markets, saying that the Commission mentioned its contentions but never answered them. See Policy and Rules Concerning Rates for Dominant Carriers, 5 FCC Rcd 2176, 2284 n. 381 (1990); MCI Brief at 35. Indeed, we have not found a direct Commission response, but it makes no difference. MCI has utterly failed to develop here whatever point it may have been trying to make before the Commission. If MCI seeks judicial review of Commission findings about the utility of Ramsey pricing, it must argue the point in its brief with enough detail to show why its claims merited an answer. Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983).
 
 
 66
 * * *
 
 The petitions for review are
 
 67
 DISMISSED.
 
 
 
 [1]
 In California v. FCC, 905 F.2d 1217, 1230 (9th Cir.1990), the 9th Circuit remanded Computer III to the FCC because of what the court viewed as inadequate agency attention to the cost shifting risk
 
 
 [2]
 I.e., the period to which the regulator looks for the market prices and quantities used to set the initial price caps
 
 
 [3]
 The baskets are (1) common line services, (2) traffic sensitive services, (3) special access services, and (4) interexchange services. LEC Price Cap Order, 5 FCC Rcd at 6811